## CHARLEY FLANDERS v. STATE.

No. A- 4141. Opinion Filed Feb. 16, 1924.
(223 Pac. 202.)

(Syllabus.)

**Larceny—Evidence not Sustaining Conviction for Cattle Theft.** In a prosecution for cattle theft, evidence stated in the opinion, and held insufficient to sustain a conviction.

Appeal from District Court, Nowata County; C. W. Mason, Judge.

Charley Flanders was convicted of the larceny of a domestic animal, and he appeals. Reversed and remanded, with directions to dismiss.

Bert Van Leuven and W. H. Kornegay, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. The plaintiff in error was tried for cattle theft, upon an information charging that he did March 28, 1921, take, steal, and carry away one bull calf and one heifer calf, the personal property of Hutton Vore. The jury returned a verdict finding him guilty as charged in the information and assessing his punishment at imprisonment in the peniteniary for a term of two years. He has appealed from the judgment rendered upon such conviction.

The first contention is that the evidence is insufficient to sustain the verdict.

The testimony shows that defendant's place adjoins that of the prosecuting witness, Vore, their houses were about a mile and a half apart. Vore had a large number of cattle, all but about fifty of which he moved to a pasture in the Osage, and returned Saturday evening, March 26, 1921. Vore testified:

" I had a little bull calf and a little white-face heifer calf that always stayed together, running on the wheat field. I missed them Monday after returning from the Osage; the next day I found the heifer on defendant's wheat and drove it home; the following day George Cotner, who works for me, brought the little bull calf home; it had a yoke on and had an undercrop out of each ear. The bull calf was put in a lot, and I told Cotner to leave him there until I got back from Kansas City; I didn't want any one to see him. The calf remained there 10 days; on the 7th of April I took the calf to Jack Morrell's place and put it in his horse lot; Jim Triethart assisted me; my father has a place between Jack Morrell's place and the defendant's place. Morrell's place is 2½ miles south of me. I rode west a mile and a half to where Morrell was fixing fence, and I told him what I had done; the next morning I went to a hill a mile south of my place and laid down; after a while I decided I was in the wrong place, and went another mile south and about a quarter east to the top of another hill in the corner of defendant's pasture. As I was laying there I saw two men driving two animals across Morrell's pasture; I watched them until they came out of Morrell's gate, and they went out of sight; in a few minutes I saw two calves coming out of the brush, about a quarter of a mile from me; I saw defendant open a gate to run these two calves into a field; the little bull calf jumped through the fence, and the heifer calf went through the gate into Bill Triethart's pasture. I rode down. Nelse Whitmire, a colored man, was standing there; I asked him if he wanted to see a cow thief caught, and he said he did. I rode around to where defendant had just fixed the fence where the calf jumped through; I said, 'Hello, Charley, have you had a few of them out?' He said, 'Yes, I had a couple of calves gone so long I thought they were dead.' I said, 'Charley, you don't mean to tell me that little bull calf is yours?' He said, 'No, Hut; that calf is not mine; I told George Cotner yesterday that I had marked that calf through a mistake; I told the boys that helped me yesterday that I had marked the wrong calf, and I told Jack Morrell a few minutes ago that I had marked that calf through a mistake.' I said,

'Yes, I know that; I have been watching you all day.' I stood up in my stirrups, and said: 'Charley, haven't I told you I would kill you if I caught you stealing my cattle?'

"He said, 'Yes; but I marked that calf through a mistake; you come with me and see another one like it that is mine, and you will not feel so bad about it.' He claimed that he had one just like it. I said, 'I have come to take that calf home; let's look at that other calf;' and we started up the pasture to look at the other calf. We rode along and I said, 'You are an amateur in this game; you are just the goat; the brains have been staying at home; they are getting you and a few more boys to drive these calves through the country and will probably slip you $25, and if it is a big deal they will slip you $50.' He said, 'I never did drive any cattle, Hut; you ought not to feel that way towards me.' We went by Charley's place. He said, 'Let's leave your calf here and look at the other one.' I said, 'No; there is only one way to look at that, and that is throw them together;' and we drove it up there. He said, 'Don't they look alike?' I said, 'Nothing, only their white faces; my calf is a motley-faced calf, and yours is a pure white-face calf.' So I went on then."

He further testified:

"His calf might have been a month or two younger than mine. He was sucking his mother and was in good shape, and my calf was a thief calf that had been rustling for himself. His calf was a white-face calf, just a small ring around its left eye. My calf was a lighter red than his, and had a red spot around its eye half as big as your hand. We rode north. I told him, 'You talked me out of prosecuting Rusty Hodge on the steer that he stole and shipped from Edna; you talked me out of that, and you are not going to talk me out of this.' He said, 'You don't think I had anything to do with that?' I said, 'Nothing, only you talked me out of prosecuting him.' I said, 'If you get out of this, it will be by the skin of your teeth, and you had better get the best damn lawyer in the state.' He said: 'Hut, rather than have you believe I stole that calf, I would give you 4 or 5

times the worth of that calf to get you not to think I tried to steal it.' I said, 'Yes, I guess you would give me 10 or 15 times the worth of it for me to keep my damn mouth shut, but you will not do it,' and I rode off and left him.''

He further testified the heifer calf that he had that day ''was not my calf; that I judge belonged to him.''

On cross-examination he stated:

''I don't know that I was laying a trap; I told Morrell I had put a calf in his lot and for him to go to Charley and get his cow and see if that was his calf, and to tell Charley that some of his stuff was with him.''

George Cotner testified that he worked for Vore; that he found the heifer calf on defendant's wheat and found the bull calf in the defendant's pasture, and that it was marked and yoked and had been castrated.

Jack Morrell testified that he went to defendant's place to get a cow and told the defendant that there was a calf in his pasture with his earmark, and there was a heifer in the pasture that was claimed by the defendant and marked; that the bull calf in question was taken away by defendant; that to him the calves did not look alike, but it was possible to mistake them.

Jim Triethart testified that he was working on his father's fence and saw defendant in company with his nephew Delbert, marking a calf, and that he saw the calf after it was yoked; that he helped Hutton Vore take a calf to Morrell's two or three days afterwards.

Sam Balch testified that defendant ran from 50 to 200 cattle; that he saw both bull calves and they were about the same size, though defendant's calf was fatter than Vore's; that he had been a brand inspector at Kansas City and the calves were distinguishable, but possibly could be mistaken, but not probably.

As a witness in his own behalf, defendant, Flanders, testified:

" I was born and lived all my life in that country; my wheat field joined Mr. Vore's, the fence was down and his cattle got over in my wheat nearly all winter, and my cattle would crawl through on to Mr. Vore's wheat; I got some yokes, and put on five or six of my cattle, and marked those that were not branded. I had 11 head to brand. I ran onto this white face calf sucking his mother, and I knew right then that I had marked somebody else's yearling, so when we got through branding I rode to Mr. Vore's place and asked George Cotner where Mr. Vore was. I told him that I had one calf gone and I thought maybe they had taken my calf through a mistake; Mr. Cotner said, 'No; your calf is over at Doc Devener's'; and I said I judged that I had marked somebody's calf through a mistake; I was referring to the bull calf; and Cotner said, 'We have got all of ours branded; both bull calves are white face Herefords, about the same size.' I had built three quarters of a mile of fence, four wire, and Mr. Vore was to build the quarter between our two wheat fields, but never did build his fence, and left it open. That morning Mr. Morrell came to me and said he had some kind of a disease among his herd, and was liable to be quarantined, and he said, 'I don't know, but I think that one of your yearlings is down there with mine; he has got your mark on it,' so I went over with him and I described this calf, and he said, 'Yes; that is the calf;' I told him that I had marked somebody's calf through a mistake; as we were riding along I saw a little heifer laying down, and I said, 'There is one of my heifers.' He said, 'No; that is not your heifer;' and I said, ' I think you are mistaken, we will catch this calf and look him over.' Mr. Morrell took down his rope and missed him; then I caught the calf and threw him; I knew it was my heifer calf and marked it right there. I had to drive these calves a quarter of a mile to turn them in; Mr. Vore rode up and said, 'You are putting them in, are you?' I said, 'Yes; I found one of mine that I thought was dead.' He said, 'How

long have you owned the other one?' I told him I had not owned that bull calf; that I was at his place and told George Cotner about marking this calf through a mistake. We drove these two calves about two miles north until we found the other; he said, 'Let's put them right together,' so we did; he looked at them, and said, 'Well, you have got an alibi.' He said if I beat this case it would be by the skin of my teeth. I tried to reason with him, but there was no reason in him at all. We had had some trouble over stock; I paid him damages to his crop by my hogs, and some of my hogs were killed on his place. He met me and was very angry; he got off his horse and jumped on me in my car; he cut me up a little with his spurs; I threw him over on the back seat, but I did not strike him.''

George Vail testified:

''I live a mile east of defendant's ranch; in March I was working on Flander's ranch, at the time defendant marked a bull calf that was not his; I was sowing oats; Harry Freeman was driving a disk; it was the noon hour; he brought the dinner over and said that he had marked a bull yearling belonging to somebody else.''

James Ray testified that he was a farmer and stockman, and, with Flanders, Jack Morrell, Jordan Morris, and Sam Balch, he examined these calves together and separately; that the same description would cover both; that looking at the calves together and picking out certain points there was a difference that was noticeable, but that he could not tell any difference in looking at them separately.

Jordan Morris testified that he had been handling cattle nearly all his life; that with others he examined these bull calves; that seeing them separately it did not look like there was any difference in their ages; that they put them together that day and Mr. Vore's seemed to be the largest; that they looked very much alike, and you could easily take one for the other.

It is contended by counsel for defendant that the evidence is insufficient to sustain the verdict.

It is the peculiar province of the jury, as we have often said, to weigh the testimony and pass upon the credibility of the witnesses.  On the other hand it becomes our duty, under the law, to examine the record in cases of this character, and, if the verdict is not sustained by substantial evidence, to set the same aside.

Without considering the evidence which is favorable to defendant, but taking into consideration that only which might tend to prove his guilt, there can be no doubt that it is insufficient to sustain a conviction.  There was no concealment in any way, and the testimony of the owner is that defendant told him that he had marked the calf by mistake.  As said by this court in Lockhart v. State, 10 Okla. Cr. 587, 139 Pac. 1158:

"Where the taking is open, in the presence of others, and there is no subsequent attempt to conceal the property, and no denial, and where possession is not obtained by force, trick, or stratagem, a strong presumption of fact arises that there was no felonious intent, which must be repelled by clear and convincing evidence before a jury may legitimately infer a felonious intent."

Having reached the conclusion that the evidence is insufficient to sustain the conviction, it is unnecessary to consider any of the other questions raised and discussed in the brief.

The judgment of the lower court is accordingly reversed and the cause remanded, with direction to dismiss.

MATSON, P. J., and BESSEY, J., concur.